United States Court of Appeals
Fifth Circuit

**F I L E D**

**May 14, 2007**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
_____

No. 05-31055
_____

JOHN FONTENOT,

Plaintiff-Appellant,

versus

McCALL'S BOAT RENTALS, INC.; SEACOR MARINE, LLC,

Defendants-Appellees.

_____

On Appeal from the United States District Court for the
Eastern District of Louisiana,
Civil Action No. 03-2831

_____

Before GARWOOD, DENNIS, and OWEN, Circuit Judges.

DENNIS, Circuit Judge:[*]

Appellant John Fontenot ("Fontenot") brought this action against McCall's Boat Rentals, Inc. ("McCall's") and SEACOR Marine, LLC ("SEACOR"), seeking recovery under section 5(b) of the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 905(b). After a bench trial before a United States Magistrate Judge, the magistrate judge entered judgment in

---

[*]Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

1

favor of the defendants-appellees, and Fontenot now appeals. For the reasons set forth below, we AFFIRM.

## I.

After considering the evidence presented at trial, the magistrate judge made the following findings of fact relevant to this appeal:

On August 26, 2002, Fontenot was employed as a roustabout by Nabors Offshore Corporation and was working on a Chevron U.S.A. platform. Fontenot and his brother, Prosper Fontenot ("Prosper"), were assigned to perform rigging work aboard the vessel M/V DEANNE McCALL, owned by McCall's and SEACOR, in connection with the backloading of cargo and equipment from the platform to the vessel. The backloading work was performed by Fontenot and Prosper, as well as crane operator Robert Willingham ("Willingham"), also a Nabors employee. Prosper served as the lead roustabout for the backloading operation. Prosper and Willingham each had two-way radios, which permitted them to communicate with each other and with the captain during the operation.

Aboard the vessel with Fontenot and Prosper were the captain of the vessel, Kevin Primeaux ("Primeaux"), and the deckhand, Randall Smith ("Smith"). Although the seas were only

2

2-4 feet, Primeaux needed to maneuver the vessel throughout the backloading process to position it under the crane and away from the platform. Primeaux gave the crane operator and roustabouts general instructions for the backloading operation, telling them to load the tallest and heaviest items toward the front of the deck and to keep the load balanced. Notwithstanding Primeaux's general instructions, Willingham, the crane operator, not Primeaux, was in charge of the backloading operation.

The cargo that was backloaded to the vessel included an 18,000-pound "wireline unit," a number of full cutting boxes, a tool pallet, a "gun rack" — a metal rack used to hold 20-foot lengths of pipe, know as "guns" — and three full, heavy, reusable nylon trash bags. Throughout the backloading operation, Fontenot and Prosper attempted to maintain a clear, unobstructed walkway from the wheelhouse to the stern of the vessel. Maintenance of a clear walkway was one of the items listed on the Job Safety Analysis ("JSA") for the operation. The JSA is a SEACOR document that is prepared by the captain of the vessel before any loading operation and is intended to identify any potential safety hazards that might arise during the course of the operation. Fontenot, Prosper, Primeaux and

Smith all signed the JSA.

The three nylon trash bags were lowered onto the vessel near the end of the backloading operation. After the bags were loaded, however, the crane operator loaded an additional cutting box onto the deck of the vessel. As the cutting box was being lowered, part of the box caught one of the trash bags, and the bag fell over onto the deck, blocking the walkway. Although Fontenot and Prosper knew that the trash bag had fallen and blocked the walkway, Primeaux and Smith were not aware of that fact,[1] and the fallen bag was never moved. After a time, the captain instructed Fontenot and Prosper to chain and bind the cargo to the deck, which they did. The fallen bag remained in the walkway for approximately 15-20 minutes as Fontenot and Prosper chained down the load.

As Fontenot finished binding the load, Smith and Prosper proceeded to the vessel's stern in order to reach the crane's personnel basket. Because there was not a clear walkway to the stern, Smith walked along the top of the gun rack. The gun rack was positioned along the starboard edge of the deck, with

---

[1]The magistrate judge found that Primeaux was never aware that the trash bag was blocking the walkway. Smith eventually became aware that the bag was blocking the walkway, as he was forced to walk along the gun rack to land the crane's personnel basket at the stern of the vessel.

4

the pipes running parallel to the rail.  The rack was not full, and there were several gaps between the pipes.  Smith and Prosper both successfully negotiated the gun rack and reached the personnel basket.  Fontenot followed, but as he walked over the gun rack, his foot slipped into a gap between the pipes and he fell, injuring himself.

The magistrate judge analyzed Fontenot's claims under the framework set out by the Supreme Court in <u>Scindia Steam Navigation Co. v. De Los Santos</u>, 451 U.S. 156 (1981), and concluded that the defendants did not breach any duty of care to Fontenot.  Specifically, the magistrate judge found that Fontenot's injury was not caused by a hazard under the active control of the defendants, and that the defendants had no duty to intervene to remedy the unsafe condition because Primeaux did not know about the condition before the accident and Fontenot did not show that the condition was unreasonably dangerous.

In making those findings, the magistrate judge expressly accepted the testimony of Primeaux, Smith, and Willingham as credible.  The magistrate judge rejected, as lacking credibility, the testimony of both Fontenot and Prosper.  The magistrate judge determined that the testimony of Fontenot and

5

Prosper was internally inconsistent, and that many parts of their testimony conflicted with the testimony of other, credible witnesses.  The magistrate judge specifically rejected Prosper's testimony that: (1) after the trash bag fell, he asked Smith to have Primeaux notify the crane operator that the crane was needed to move the fallen bag; and (2) he could not contact the crane operator himself because the battery on his radio had died and the crane operator would not have been able to see hand signals.

Based on these findings of fact and conclusions of law, the magistrate judge held that Fontenot had not established that the defendants breached any duty to him, and, accordingly, the magistrate judge entered judgment in favor of the defendants.

## II.

On appeal after a bench trial, this court reviews the district court's resolution of questions of law and mixed questions of law and fact <u>de</u> <u>novo</u>.  <u>See</u> <u>Luhr Bros., Inc. v. Crystal Shipowning, Pte. Ltd. (In re Luhr Bros. Inc.)</u>, 325 F.3d 681, 684 (5th Cir. 2003).  Questions about the existence or scope of a vessel owner's duties to an independent contractor are questions of law.  <u>See</u> <u>Manuel v. Cameron Offshore Boats,</u>

6

<u>Inc.</u>, 103 F.3d 31, 33 (5th Cir. 1997); <u>Fontenot v. Travelers</u> <u>Ins. Co.</u>, 89 F.3d 205, 208 (5th Cir. 1996). The district court's findings of fact are reviewed for clear error. <u>See</u> <u>Moore v. ANGELA MV</u>, 353 F.3d 376, 380 (5th Cir. 2003); <u>Turner</u> <u>v. Costa Line Cargo Servs., Inc.</u>, 744 F.2d 505, 507-08 (5th Cir. 1984). In an admiralty case, determinations about the existence of negligence are considered as findings of fact and are subject to clear error review. <u>See</u> <u>Luhr Bros.</u>, 325 F.3d at 684; <u>Manuel</u>, 103 F.3d at 33; <u>Theriot v. Bay Drilling Corp.</u>, 783 F.2d 527, 535 n.6 (5th Cir. 1986).

## III.

Fontenot makes three arguments on appeal. First, he claims that the magistrate judge erred by rejecting Prosper's uncontradicted testimony that he asked Smith, the deckhand, to have the captain call the crane operator to tell him that the roustabouts needed the crane in order to move the fallen trash bag. Second, Fontenot argues that the magistrate judge erred when he found that the defendants did not maintain "active control" over the deck at the time of the accident. Third, Fontenot asserts that the defendants had a duty to intervene because they were aware that the fallen trash bag created an unreasonably dangerous condition.

**A.**

Fontenot's first argument — that the magistrate judge erred by not accepting Prosper's testimony that he asked Smith to tell the captain that the roustabouts needed the crane in order to move the fallen trash bag — merits little discussion. Fontenot asserts that the magistrate judge was required to accept Prosper's testimony on that point because no other witness specifically testified about whether or not Prosper spoke to Smith.

Regardless of whether Prosper's testimony conflicted with other evidence on this specific point, however, the magistrate judge did not clearly err by refusing to credit that testimony. It is well-established that credibility determinations are reserved for the trial judge or the jury, and this court "cannot second guess the district court's decision to believe one witness' testimony over another's or to discount a witness' testimony." Canal Barge Co. v. Torco Oil Co., 220 F.3d 370, 375 (5th Cir. 2000). Moreover, the finder of fact is not necessarily obliged to accept a witness's testimony, even if some parts of it are not directly contradicted by other testimony in the record. See Lujan v. United States, 431 F.2d 871, 872 (5th Cir. 1970). In this case, the magistrate judge

explained in detail why he did not believe that Prosper's testimony was credible — he found that the testimony was internally inconsistent and conflicted with the testimony of other witnesses who the magistrate judge found credible. Fontenot has not, and cannot, show that those credibility determinations were unsupported by the record. Under these circumstances, we cannot say that the magistrate judge clearly erred by rejecting Prosper's testimony.

**B.**

Fontenot's remaining arguments are that the magistrate judge erred when he held that the defendants did not breach any duties that they owed to Fontenot under Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156 (1981). In Scindia, the Supreme Court held that a vessel owner owes three duties to workers covered under section 5(b) of the LHWCA, 33 U.S.C. § 905(b): (1) the "turnover duty," which requires the vessel owner to have the vessel in such a condition that an experienced stevedore could safely conduct cargo operations and to warn the stevedore of any hazards that the stevedore would likely encounter during its cargo operations, id. at 166-67; (2) the "active control duty," under which the owner may be liable for injuries if it "actively involves itself in the

9

cargo operations and negligently injures a longshoreman," or fails to exercise due care to protect longshoremen "from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation," id. at 167; and (3) the "duty to intervene," which provides that a vessel owner can be liable if it fails to intervene when it knows of an unreasonably dangerous condition that has developed during the course of the stevedoring operations and it knows that the stevedore, in the exercise of obviously improvident judgment, intends to continue working in the face of the danger and cannot be relied upon to protect its workers.  Id. at 175-76.[2]  Only the second and third Scindia duties — the active control duty and the duty to intervene — are relevant to this appeal.

### 1.  Active Control

As noted above, a vessel owner may be liable under Scindia's active control duty if it actively involves itself in cargo operations or fails to protect contractors from hazards in areas under the active control of the vessel.  The

---

[2]This court has held that the principles of Scindia, though formulated in the context of the respective duties of vessel owners and stevedores, apply equally to any suit by an LHWCA-covered employee working for an independent contractor aboard a vessel. See Manuel, 103 F.3d at 33 n.6; Masinter v. Tenneco Oil Co., 867 F.2d 892, 896 (5th Cir. 1989).

magistrate judge held that the defendants did not breach Scindia's active control duty because Nabors employees, not the vessel's crew, maintained active control over the backloading operation. Fontenot does not seriously challenge this conclusion, but instead argues that although the defendants did not actively control the backloading operation, they nevertheless retained active control of the entire vessel, including the deck, throughout the backloading operation, by virtue of (1) the SEACOR-Chevron blanket time charter, (2) the JSA, and (3) industry custom.

To determine whether an area is in the active control of the vessel owner, this court generally considers whether the area in question is within the contractor's work area and whether the work area has been "turned over" to the contractor. See, e.g., Fontenot, 89 F.3d at 208 (discussing earlier cases and finding no active control where entire vessel was turned over to contractor); Pimental v. LTD Canadian Pac. Bul, 965 F.2d 13, 16-17 (5th Cir. 1992) (finding that vessel owner did not have active control over crane where crane was necessary to stevedore's work and was being operated by stevedore); Masinter, 867 F.2d at 897 (finding that vessel owner had active control where owner did not turn over any area of vessel to

11

contractor and where owner admitted in interrogatories that its crew was solely responsible for placement of stairwell where injury occurred); Theriot, 783 F.2d at 535 (finding active control based on district court's finding that owner "continued to control the work area [and] retain[ed] the obligation to clean the keyway deck"); Turner, 744 F.2d at 508-09 (finding active control where hazard was located "outside the area of normal and routine cargo operations" and outside longshoreman's "work area").

None of Fontenot's arguments merit reversal of the magistrate judge's decision. Although, as the magistrate judge recognized, the captain of the vessel retains the ultimate authority to make decisions about the operation of the vessel and the safety of those aboard, this overarching authority is not the equivalent of "active control" for purposes of the owner's duties under Scindia. This court has described active control within the meaning of Scindia as instead being akin to operational control at the time of the activities in question:

> This duty recognizes that although a vessel owner no longer retains the primary responsibility for safety in a work area turned over to an independent contractor, no such cession results as relates to areas or equipment over which the vessel's crew

12

<u>retains operational control</u>.

<u>Manuel</u>, 103 F.3d at 34 (emphasis added); <u>cf.</u> <u>Howlett v.</u> <u>Birkdale Shipping Co.</u>, 512 U.S. 92, 104-05 (1994) ("The vessel's responsibilities . . . are commensurate with its access and control . . . . Because the vessel does not exercise the same degree of operational control over, and does not have the same access to, the cargo stow, its duties with respect to the stow are limited by comparison."). Thus, even accepting Fontenot's arguments that the captain retained ultimate control over all areas of the vessel under the blanket time charter and industry custom, neither the time charter nor custom establishes that the captain had <u>active</u> control over the deck during the backloading operation. Nor does the JSA establish active control. Although the JSA specified that a clear walkway should be maintained and the captain testified that it was his responsibility, Fontenot has not established that the JSA, which was also signed by Fontenot and Prosper, gave the captain active or operational control over the deck during the operation, or otherwise created an independent duty running from the vessel owners to the subcontractors working on the deck.

The facts found by the magistrate judge make it clear that

13

Nabors and its employees, not the defendants, maintained active control over the deck throughout the backloading operation. The deck was the roustabouts' work area, Nabors exercised operational control over the backloading operation itself and over the deck during the operation, and Nabors employees created the hazard that ultimately resulted in Fontenot's injury. Accordingly, we hold that the magistrate judge correctly found that defendants did not breach Scindia's active control duty on these facts.

## 2. Duty to Intervene

Fontenot finally claims that the magistrate judge erred by finding that the defendants did not have a duty to intervene under Scindia to protect Fontenot from the hazard created by the fallen trash bag.

The Scindia duty to intervene to protect longshoremen from dangers that arise during the course of their work "is a narrow one." Futo v. Lykes Bros. S.S. Co., 742 F.2d 209, 216 (5th Cir. 1984). To establish a duty to intervene, the plaintiff must first show that the vessel owner was actually aware of the dangerous condition. Helaire v. Mobil Oil Co., 709 F.2d 1031, 1039-40 (5th Cir. 1983) ("[A]ctual, not constructive, knowledge is mandated by the Supreme Court's Scindia requisites for

14

liability under § 905(b) . . . ."). But this court has repeatedly held that the duty to intervene requires that the plaintiff show "something more" than that the vessel owner was aware of a dangerous condition on the vessel. <u>Futo</u>, 742 F.2d at 715; <u>see</u> <u>Greenwood v. Societe Francaise De</u>, 111 F.3d 1239, 1249 (5th Cir. 1997); <u>Singleton v. Guangzhou Ocean Shipping Co.</u>, 79 F.3d 26, 29 (5th Cir. 1996). This court has characterized that "something more" as requiring that the plaintiff

> show not only that the shipowner had actual knowledge of the defect and of the stevedore's continuing use of the defective item, but also "(1) it had actual knowledge that the [defect] posed an unreasonable risk of harm and (2) actual knowledge that it could not rely on the stevedore to protect its employees and that if unremedied the condition posed a substantial risk of injury."

<u>Greenwood</u>, 111 F.3d at 1248 (quoting <u>Randolph v. Laeisz</u>, 896 F.2d 964, 971 (5th Cir. 1990)) (alteration in original).

Moreover, a vessel owner is generally permitted to rely on the contractor's expert judgment as to the safety of its working conditions. <u>See</u> <u>id.</u> at 1249. To trigger the owner's duty to intervene, a dangerous condition must be "so hazardous that anyone can tell that its continued use creates an unreasonable risk of harm." <u>Id.</u> at 1249. Although this court

15

considers a number of relevant factors to determine whether a vessel owner has a duty to intervene on a particular set of facts,[3] we have held that <u>Scindia</u>'s duty to intervene "does not . . . extend to an open and obvious transitory condition . . . that is created entirely by the independent contractor, is under its control, and relates wholly to its own gear and operations." <u>Futo</u>, 742 F.2d at 216.

The magistrate judge found that the defendants had no duty to intervene in this case because the captain was never aware that the fallen trash bag was blocking the walkway, and, in any event, neither the defendants nor the Nabors employees knew or believed that the condition was unreasonably dangerous. Fontenot asserts that the magistrate judge's conclusion was erroneous. He argues that the deckhand, Smith, was aware of the fallen trash bag, and that Smith's knowledge should be imputed to the captain and to the defendants.

It is clear that Smith became aware at some point that the trash bag was blocking the walkway, as Smith was the first to

---

[3]<u>See</u> <u>Fontenot</u>, 89 F.3d at 209 (stating that court will consider "(1) whether the danger was open and obvious, (2) whether the danger was located in the ship or ship's gear; (3) which party created the danger or used the defective item and was therefore in a better position to correct it; (4) which party owned and controlled the defective item; (5) whether an affirmative act of negligence or acquiescence in the use of a dangerous item occurred; and (6) whether the shipowner assumed any duty with regard to the dangerous item").

traverse the gun rack to reach the stern of the vessel. Even assuming, however, that Smith's knowledge can be imputed to the captain and the defendants, Fontenot has not pointed to any evidence in the record that would support finding a duty to intervene in this case. First, the hazard that ultimately caused Fontenot's injury — the obstructed walkway — was wholly created by Nabors personnel, was within the roustabouts' work area, was open and obvious to the roustabouts, and could have been remedied by Nabors personnel if they believed it to be unreasonably dangerous. Second, the evidence at trial did not establish that the vessel's crew believed that the obstruction created an unreasonable risk of harm. Smith, the only crew member who became aware of the obstruction, was the first person to walk along the gun rack to reach the stern of the vessel, which undermines any suggestion that he knew or believed that the obstruction created an unreasonably dangerous working condition. Accordingly, we find that the magistrate judge did not err in concluding that defendants did not have a duty to intervene under Scindia in this case.

## CONCLUSION

For the reasons stated above, we AFFIRM the judgment of the magistrate judge.

17

**AFFIRMED.**